August H. GANZE, Jr., et al.,
Plaintiffs-Appellees,

v.

DART INDUSTRIES, INC.,
Defendant-Appellant.

No. 83–1509.

United States Court of Appeals,
Fifth Circuit.

Sept. 17, 1984.

Rehearing Denied Oct. 15, 1984.

Kerr, Fitz-Gerald & Kerr, William Monroe Kerr, Midland, Tex., for defendant-appellant.

James Boldrick, Midland, Tex., for plaintiffs-appellees.

Before BROWN, GEE and RUBIN, Circuit Judges.

JOHN R. BROWN, Circuit Judge:

This case was commenced as a class action in diversity. Plaintiff—a terminated and fully vested former employee of a recently sold Dart division—sought to recover a forty-five cent per share cash quarterly dividend from the Dart Industries' profit sharing trust for himself and all former employees who participated in the pension fund. Plaintiff alleged the trustees acted arbitrarily and inconsistently in administering the plan and that they capriciously treated stock and cash dividends differently. The District Court certified the class action and rendered judgment for the plaintiff. We reverse and hold that the Employee Retirement Income Security Act contemplates a company-wide pension fund which incidentally rewards long term employees and that this permissible incentive, when applied on a consistent basis in the quarterly division of unvested shares is not a violation of trustee's fiduciary duties to terminated employees.

### The Pension Vehicle

The Dart Industries' profit sharing retirement plan was created by declaration of trust in 1955. At the end of 1979 it held over $90,000,000 in assets. Briefly, the plan provided for the creation of four separate trust accounts. Employees elected to participate in the fund or funds of their choice. Only one of the funds, designated Fund B, is the concern of this lawsuit. Fund B holds company contributions which are invested in the common stock of Dart Industries. Each fund is valued and profits or losses are allocated to participants at the end of each quarter. The funds are the responsibility of an advisory committee appointed by the Board of Directors of Dart Industries.

### The Squeaky Wheel

Plaintiff August H. Ganze, Jr. became a participant in the Dart Industries' pension fund as soon as he became eligible. Pursuant to the agreement executed by all participants, he elected to have his company contributions placed in Fund B. When Mr.

Ganze was terminated by Dart Industries—after the sale of the division for which he worked to another company—he and all other employees who were not already fully vested became fully vested in their pension monies. Much time was spent in the lower court and at oral argument trying to illumine the meaning of vesting. In essence, vesting means only that an interest is no longer subject to possible forfeiture and an employee becomes entitled to all of the amounts which have been credited to his pension account. For this case, the valuation of a terminated vested employee's aliquot share in Fund B was made on June 30, 1979.[1]

Under the terms of the plan, the quantity of stock and money that is to be distributed to an employee is subject to total or partial forfeiture depending upon the reason for termination. Here, however, all employees were fully vested and they were to receive their contribution as soon as practicable.

### The Breakdown

In essence, Ganze complains that he and his fellow vested workers did not receive their aliquot share of a quarterly forty-five cent dividend that was declared on Dart stock on September 14, 1979. He maintains this proposition despite the termination of his employment on August 31, 1979. The bases of his contention are (i) the advisory committee arbitrarily and inconsistently administered the plan, and (ii) capriciously treated stock and cash dividends differently.

### The Diagnostic Test

█ While neither party founded a claim of federal jurisdiction upon the basis of the Employee Retirement Income Security Act of 1974, Pub.L. No. 93–406 (29 U.S.C. § 1001–1381) (ERISA) in the trial court, nor raised the issue in their briefs on appeal, we hold that jurisdiction was proper in the District Court under 29 U.S.C. § 1132.

Section 1132(a) provides that a civil action may be brought by a retirement plan participant to recover benefits or to enforce rights under a plan. Section (e)(1) gives the federal District Court concurrent jurisdiction with state courts. Section (f) specifies that the District Court's jurisdiction does not depend upon the amount in controversy. Accordingly, all the hard fought issues in the lower court as to aggregation of the amount in controversy to secure diversity jurisdiction need not trouble us any longer.

Ganze attacks the decision of the trust fund advisory committee not to pay employees terminated in June the September dividend. He points out that Dart Industries distributed the December 1979 dividend to members of the class and maintains that conditions were identical. He also maintains that the trust was arbitrary in treating stock and cash dividends differently. For the foregoing reasons, Ganze argues that the fund trustees violated their fiduciary duties; he also contends that the fund trustees violated their duty of loyalty to the beneficiaries—because their method of allocating dividends after termination of employees gave the trustees an interest adverse to that of the terminated beneficiaries. We will discuss these contentions one at a time under the standard of review adopted by this Court in *Dennard v. Richards Group, Inc.*, 681 F.2d 306, 313–14 (5th Cir.1982).

The District Court in the first instance, and this Court on appeal, in reviewing the actions of administrators of an employee benefit plan, utilize an "arbitrary and capricious" standard of review. *Paris v. Profit Sharing Plan for Employees of Howard B. Wolf, Inc.*, 637 F.2d 357, 362 (5th Cir.), *cert. denied*, 454 U.S. 836, 102 S.Ct. 140, 70 L.Ed.2d 117 (1981); *Bayles v. Central States, Southeast and Southwest Areas Pension Fund*, 602 F.2d 97, 99 & 100 n. 3 (5th Cir.1979). "According to the clear

---

1. "In determining the amount available at the date of termination of employment ... the value of the PARTICIPANTS ... Fund B account ... shall be determined as of the TRUST valuation date *next preceding* the PARTICIPANTS TERMINATION OF EMPLOYMENT." Plan at § 7.08(c)(iv) (emphasis added).

weight of federal authority, the actions of the trustees in the administration of the pension plan must be sustained as a matter of law unless plaintiff can prove such activities have been arbitrary or capricious." *Bayles, supra.* This standard, traditionally used for review of trusts, has been applied by several other circuits.[2] Such a standard prevents excessive judicial intervention in trust operations. *Rehmar v. Smith,* 555 F.2d 1362, 1371 (9th Cir.1976).

Federal courts have applied the arbitrary and capricious standard both to ambiguous and unambiguous terms. A rational and reasonable interpretation of a plan may still be arbitrary and capricious if contrary to the plain meaning of the plan. "Where the trustees impose a standard not required by the pension plan itself, this court has stated that such action 'would result in an unwarranted and arbitrary construction of the Plan.' " *Morgan v. Mullins,* 643 F.2d at 1321 (8th Cir.1981) (*quoting Maness v. Williams,* 513 F.2d at 1267). *See Richardson v. Central States, Southeast & Southwest Areas Pension Fund,* 645 F.2d 660, 663 n. 3 (8th Cir.1981). Another Eighth Circuit opinion, *Bueneman v. Central States, Southeast & Southwest Areas Pension Fund, supra,* a case also relied on in *Morgan, supra,* was noted with approval in our decisions in *Bayles, supra,* and *Howard Wolf, supra.* The Seventh Circuit, in applying the arbitrary and capricious yardstick, has stated that this standard apparently originated with the District of Columbia Circuit's formulation of "whether the Trustees have acted arbitrarily, capriciously, or in bad faith; that is, is the decision of the Trustees supported by substantial evidence or have they made an erroneous decision on a question of law." *Wardle v. Central States, Southeast & Southwest Areas Pension Fund,* 627 F.2d at 823.

In *Bayles,* we indicated certain factors to be considered in applying the arbitrary and capricious standard: (1) unformity of construction; (2) "fair reading" and reasonableness of that reading; and (3) unanticipated costs. We there determined that the pensioner's interpretation of the plan would render another section of the plan meaningless and that "[a] fair reading of the provision" revealed that the language's purpose was that maintained by the trustees. Along with the determination of the "legally" correct meaning of the plan provision in question, we also view as probative of the good faith of a trustee or administrator the following factors: (1) internal consistency of a plan under the interpretation given by the administrators or trustees; (2) any relevant regulations formulated by appropriate administrative agencies; and (3) factual background of the determination by a plan and inferences of lack of good faith, if any. *The fact that a trustee's interpretation is not the correct one as determined by a District Court does not establish in itself arbitrary and capricious action,* but is a factor in that determination. (emphasis added)

## I.

■ Despite Ganze's claim, Dart Industries' payment of the December dividend is irrelevant to this case. The reason that it is of no significance is because it was paid by the company out of recognition of the consequences for an undue delay in making disbursements from the trust to the terminated employees. Dart Industries was undergoing a merger and as a result, its payments from the trust to the terminated

---

**2.** *See e.g., Riley v. MEBA Pension Trust,* 570 F.2d 406, 410 (2d Cir.1977); *Wardle v. Central States, Southeast & Southwest Areas Pension Fund,* 627 F.2d 820, 823–24 (7th Cir.1980), *cert. denied,* 449 U.S. 1112, 101 S.Ct. 922, 66 L.Ed.2d 841 (1981); *Reiherzer v. Shannon,* 581 F.2d 1266, 1272 (7th Cir.1978); *Morgan v. Mullins,* 643 F.2d 1320, 1321 (8th Cir.1981); *Bueneman v. Central States, Southeast & Southwest Areas Pension Fund,* 572 F.2d 1208, 1209 (8th Cir.1978); *Maness v. Williams,* 513 F.2d 1264, 1265 (8th Cir. 1975) (case based on Labor-Management Relations Act); *Rehmar v. Smith,* 555 F.2d at 1366– 67, 1369–71 (9th Cir.1976) (Labor-Management Relations Act case); *Lowenstern v. International Assoc. of Machinists and Aerospace Workers,* 479 F.2d 1211, 1213 (D.C.Cir.1973) (pre-ERISA case).

employees took longer than was originally foreseen. The December dividend was paid not under any legal obligation, but under a moral one to compensate the former employees for the delay in trust distribution.

There has been much confusion in this case as to vesting and ownership. It is blackletter law that the trustees hold title to trust assets; beneficiaries have only an equitable interest in the trust property. Thus, the Dart dividend never could have belonged to the employees, but only to the trust which held title to the Dart stock. The lower court seemed to confuse ownership with vesting. Vesting only relates to the length of service and the forfeiture provisions of pension funds, not to the vesting of title.

The assets of Fund B are valued at the end of each quarter. The total dollar value is allocated to the accounts of the various fund participants without regard to vesting. When employment is terminated, an employee has only a claim to a percentage of the dollar amount credited to his account at the end of the preceding quarter, not any direct ownership in particular fund assets. A terminated participant neither enjoys—nor suffers—changes in the value of fund assets which occur between the last valuation date and his date of termination. As the plan was consistently administered, gains and losses occurring after a termination date inure to those who remain as participants in the fund. Obviously, if a dividend is declared on stock after an employee is terminated, he does not receive the benefit of it because it was not his to receive. Just as obviously, those employees who were not terminated will divide that dividend when the valuation date arrives. Such a practice, consistently followed as in this case, is neither arbitrary nor capricious.[3]

## II.

Ganze also attacks the distinction drawn between declared stock dividends and cash dividends. However, it seems eminently reasonable to us that Dart would treat stock and cash dividends consistent with their treatment under the Internal Revenue Code and generally accepted corporate law. *Eisner v. Macomber*, 252 U.S. 189, 40 S.Ct. 189, 64 L.Ed. 521 (1920). Stock dividends are changes in the form of a company's capital structure. They are not income, but a change in the form of the original shares. No such rationale prevails for the distribution of a cash dividend declared after an employee has terminated his employment and become vested in his percentage of the retirement fund. A cash dividend is paid from earnings; it does not represent the capital stock of the company.

## III.

Finally, Ganze maintains that the advisory committee charged with overseeing Fund B violated its fiduciary duty to terminated employee beneficiaries because the allocation of dividends to employees still in the plan benefitted the advisory committee members personally. He buttresses his case with the general law of trust and its well-known principle that a trustee can never place himself in a position of conflict of interest with the benefi-

3. As a long term employee, Ganze was the beneficiary of this valuation practice for nearly sixty quarters. *See generally*, FRES, Employee Benefits § 38.138:

A plan may provide that forfeitures resulting from separation from service are to be reallocated to employees who are plan participants at the end of the plan year of forfeiture, or it could provide that forfeitures are to be reallocated to employees who were participants at the end of the plan year in which the forfeiting employee separated from service. Either provision is acceptable if it is applied on a consistent basis. (footnote omitted)

*Example:* A profit sharing plan adopts the calendar year as its plan year. Under the plan, a forfeiture of employer-derived accrued benefits arises when a participant who has separated from service incurs a 1-year break in service. Under the plan, forfeitures are reallocated as of December 31 of each year. An employee separates from service on December 1, 1979 when he had a vested right to 25 percent of employer-derived accrued benefits. He incurs a 1-year break in service on December 31, 1980. The plan may provide that forfeitures are to be reallocated to employees who were plan participants on December 31, 1974 (the end of the plan year in which the separating employee left) or December 31, 1980 (the end of the plan year of forfeiture).

ciary. While as a general rule we certainly agree with this proposition, it remains precisely that, a general proposition. In the case before us we have a pension fund governed by ERISA. We hold that the very terms of this comprehensive piece of legislation for the regulation of pension funds allows an employer to operate and his designated employees to manage a company-wide pension plan. In this case—under the statutory scheme—the members of the advisory committee did not violate any fiduciary duty to the plaintiff class because their individual percentage of interest in any quarterly dividend funds allocated after the employee's termination date was essentially infinitesimal. Additionally, such a division can naturally be seen as a permissible incentive to long-term employment—a legitimate and well recognized purpose in the formation of pension plans.

REVERSED.